# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JAMES LEO CARNEY et al.,
Defendants and Appellants.

S260063

Third Appellate District
C077558

Sacramento County Superior Court
11F00700

---

July 20, 2023

---

Justice Jenkins authored the opinion of the Court, in which
Chief Justice Guerrero and Justices Corrigan, Liu, Kruger,
Groban, and Evans concurred.

---

PEOPLE v. CARNEY

S260063

Opinion of the Court by Jenkins, J.

In *People v. Sanchez* (2001) 26 Cal.4th 834 (*Sanchez*), this court upheld the first degree murder conviction of a defendant who had engaged in a gang-related shootout that left an innocent bystander dead. Though it was unclear whether the defendant or a rival gang member had fired the fatal shot, we held that the defendant's "commission of life-threatening deadly acts in connection with his attempt on [the rival gang member's] life was a substantial concurrent, hence proximate, cause of [the victim's] death." (*Id.* at pp. 848–849.)

The instant case similarly involves a gun battle among rivals, but unlike in *Sanchez*, the evidence here conclusively established that the fatal shot was fired by someone other than the two defendants whose first degree murder convictions are at issue. The question now before us is whether *Sanchez*'s "substantial concurrent cause" analysis of proximate cause permits the defendants' convictions. The Court of Appeal answered this question in the affirmative, emphasizing that in *Sanchez*, each defendant's liability for first degree murder was not based on the mere possibility that he had fired the fatal shot. Rather, the court explained, both defendants in *Sanchez* " 'had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots' such that it was not unfair to hold them equally responsible for the victim's death." (*People v. Carney* (Dec. 10, 2019, C077558 [nonpub. opn.].) Based on that reasoning, the Court of Appeal

concluded that the actions of defendants Lonnie Orlando Mitchell and Louis James Mitchell (collectively, the Mitchells) were sufficient to demonstrate that each proximately caused the victim's death, regardless of who actually shot the victim.

For reasons that follow, we agree with the Court of Appeal that, although neither of the Mitchells fired the fatal shot, their life-threatening deadly actions constituted proximate cause consistent with our holding in *Sanchez, supra*, 26 Cal.4th 834. We affirm the Court of Appeal's judgment.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

In the early afternoon of December 14, 2010, the Mitchells entered a South Sacramento barbershop frequented by members of the G-Mobb street gang. The Mitchells were not members of G-Mobb and had a history of confrontation with several G-Mobb gang members. Lonnie Mitchell entered the barbershop with a TEC-9 assault weapon hanging from a cord around his neck; the outline of the weapon was visible under his hoodie. He spoke on his cell phone while he paced back and forth inside the barbershop, explaining to his caller that he wanted to "shoot the place up." Witnesses reported that Louis Mitchell, who appeared to be carrying a gun, put on a barbershop cape and sat in a chair, as if waiting for a haircut.

---

[1] Our grant of review also included the following question: "What impact, if any, do *People v. Chiu* (2014) 59 Cal.4th 155 and Senate Bill No. 1437 (Stats. 2018, ch. 1015, § 1, subd. (f)) have on the rule of *Sanchez*?" As we explain below (see *post*, at pp. 19–22), neither *Chiu* nor Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) has any impact on whether our holding in *Sanchez* applies in this case.

Larry Jones and Ernest S. — friends of defendant James Leo Carney — were both inside the barbershop when the Mitchells entered. Ernest was seated in a barber's chair wearing a cape while his son, who sat adjacent to him, was getting a haircut. Concerned about the Mitchells' hostile armed presence in the shop, Jones called Carney and asked him to pick him up, along with Ernest and Ernest's son. Carney then called Marvion Barksdale. Lonnie Mitchell had recently threatened to kill Barksdale over a dispute involving a robbery.

Armed with a revolver, Carney drove to the barbershop. When he arrived, he parked across the street from the barbershop and stood outside his car. Ernest quickly left the shop with his son and placed him in Carney's car.

Barksdale also drove to the barbershop with several passengers including Dominique Marcell Lott. When they arrived, Barksdale and Lott exited the vehicle, and armed with guns, began walking toward the barbershop. The Mitchells were standing outside the shop. Gunfire erupted. Louis Mitchell, who was still wearing the barber's cape, fired shots towards Carney and Ernest. Lonnie Mitchell fired the assault weapon wildly, according to one witness. Barksdale and Lott were both shot; Barksdale later died. The evidence was inconclusive as to who fired the first shots.

During the exchange of gunfire, a shot fired by Carney struck and killed a bystander, Monique N., as she stood at the open rear door of her SUV shielding her two-year-old son. Monique and her son had just posed for Christmas photos at a studio next door to the barbershop. She was pronounced dead at the scene.

Before fleeing the scene in a waiting car, the Mitchells fired several more shots from the front of the barbershop, hitting and injuring four other bystanders inside the shop (John E., Adam W., Joshua B., Gralin M.). Jones who was still in the barbershop, fled out the back while firing his handgun at the Mitchells. Jones escaped without injury.

As relevant here, the Sacramento County District Attorney filed an information charging the Mitchells, Carney, and Jones with murder (Pen. Code,[2] § 187, subd. (a)) for the death of Monique, and with four counts of assault with a firearm (§ 245, subd. (a)(2)) for the four injured victims in the barbershop. The information further alleged that Carney and Jones committed the murder for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) Before trial, Lott pleaded guilty to voluntary manslaughter and was sentenced to 21 years in prison.

At trial, all four defendants asserted they had acted in self-defense — i.e., that participants on the other side were the aggressors who shot first. When the evidentiary portion of the trial concluded, the trial court instructed that "[a] defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death." (See CALCRIM No. 521.) The court also instructed the jury with

---

[2] All statutory references are to the Penal Code unless otherwise noted.

CALCRIM No. 520,[3] which, as given, explained in part that "[w]hen the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death." This instruction also provided that "[m]urder under natural and probable consequences is murder in the second degree." Additionally, the court gave CALCRIM No. 562, which provided that "[i]f the defendant intended to kill one person, but by mistake or accident killed someone else, then the crime, if any, is the same for the unintended killing as it is for the intended killing." A second paragraph of this instruction explained that any defenses "which apply to the intended killing, also apply to an unintended killing," including "defenses that decrease the level of homicide."

The jury found both of the Mitchells guilty of first degree murder. It acquitted Carney of murder but found him guilty of voluntary manslaughter. As to the four assault victims, the jury found the Mitchells guilty of the charges but found Carney not guilty. It acquitted Jones on all counts.

The Mitchells appealed their first degree murder convictions. They argued that because neither had fired the shot that killed Monique, the jury must have found them guilty of murder based on their alleged status as accomplices. Citing

---

[3] Though the standard instruction CALCRIM No. 520 explains that "[t]here may be more than one cause of death," it does not include language regarding "concurrent" causes, which is contained in CALJIC No. 3.41. (See *post*, at p. 8.) CALCRIM No. 520 provides that a substantial factor, which is "more than a trivial or remote factor," "does not have to be the only factor that causes the death." The trial court here instructed the jury in language virtually identical to CALJIC No. 3.41.

our then-recent *Chiu* opinion, they argued their culpability was limited to second degree murder. The Court of Appeal rejected the Mitchells' contentions. Relying on *Sanchez*, *supra*, 26 Cal.4th 834, it explained that the Mitchells' first degree murder convictions were based on their own " 'culpable mens rea (malice),' not on vicarious liability for aiding and abetting," which, coupled with the evidence that their actions proximately caused the victim's death, provided sufficient evidence for their convictions.

The Mitchells filed petitions for review in this court, which we granted in part as to the question of *Sanchez*'s applicability in this case.[4] For reasons explained below, we reject the Mitchells' assertion that *Sanchez*'s "substantial concurrent cause" analysis is limited to situations in which it is unclear who among the participants in a gun battle actually fired the shot that killed the victim. Rather, *Sanchez* establishes that the conduct of a participant in a gun battle who did not fire the fatal shot may contribute substantially and concurrently to — and be a proximate cause of — the victim's death. (*Sanchez*, *supra*, 26 Cal.4th at pp. 845–849.)

## DISCUSSION

### A.  Proximate Cause

"Murder includes both actus reus and mens rea elements. To satisfy the actus reus element of murder, an act of either the defendant or an accomplice must be the proximate cause of death." (*People v. Concha* (2009) 47 Cal.4th 653, 660, italics

---

[4]  The Court of Appeal also affirmed Carney's manslaughter conviction. He petitioned for review in this court, but we denied his petition.

omitted.) Specifically, "a 'cause of the death of [the victim] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' (See CALJIC No. 3.40.) In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 36, p. 242.)" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*).) An intervening force, in turn, "is one which actively operates in producing harm to another after the actor's . . . act or omission has been committed." (Rest.2d Torts, § 441, subd. (1); see *People v. Schmies* (1996) 44 Cal.App.4th 38, 46 (*Schmies*) ["principles of causation apply to crimes as well as torts"].)

Broadly speaking, proximate cause consists of two components. One is cause in fact (also called actual or direct causation). " ' "An act is a cause in fact if it is a necessary antecedent of an event" ' " (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352 (*State Dept. of State Hospitals*)), and it is commonly referred to as the "but-for" cause of death. (See CALJIC No. 3.40; CALCRIM No. 240 [Causation]; CALCRIM No. 520 [First or Second Degree Murder with Malice Aforethought (Pen. Code, § 187)].) The second component " 'focuses on public policy considerations. Because the purported [factual] causes of an event may be traced back to the dawn of humanity, the law has imposed additional "limitations on liability other than simple causality." [Citation.] "These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with

public policy." ' " (*State Dept. of State Hospitals, supra,* 61 Cal.4th at p. 353.)[5]

As relevant here, when there is evidence of concurrent causes, we have held that " '[t]o be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 643 (*Jennings*); see CALJIC No. 3.41; see also CALCRIM No. 520.) "[A] cause is concurrent if it was 'operative at the time of the murder and acted with another cause to produce the murder.' " (*People v. Crew* (2003) 31 Cal.4th 822, 846 (*Crew*), quoting CALJIC No. 3.41.) " '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death.' " (*Jennings,* at p. 643.)

The limitation on liability under the second component of proximate cause comes down to the question of foreseeability. (See *People v. Roberts* (1992) 2 Cal.4th 271, 321 (*Roberts*).) "The object of the criminal law is to deter the individual from committing acts that injure society by harming others, their property, or the public welfare, and to express society's

---

[5]     When referred to generally, the term " ' "proximate cause 'is ordinarily concerned, not with the fact of causation [i.e., cause in fact], but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.' " ' [Citation.]"   [Citation.] As Witkin puts it, '[t]he doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, the defendant will nevertheless be absolved because of the manner in which the injury occurred.' " (*State Dept. of State Hospitals, supra,* 61 Cal.4th at p. 353.)

condemnation of such acts by punishing them. 'The purpose of the criminal law is to define socially intolerable conduct, and to hold conduct within . . . limits . . . reasonably acceptable from the social point of view.' " (*Id.* at p. 316.) "The criminal law thus is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." (*Id.* at p. 319.) Put simply, "[a] result cannot be the natural and probable cause of an act if the act was unforeseeable." (*Id.* at pp. 321–322; see *People v. Fiu* (2008) 165 Cal.App.4th 360, 372 (*Fiu*) ["language in CALJIC No. 3.40 requiring an injury or death to be a direct, natural, and probable consequence of a defendant's act necessarily refers to consequences that are reasonably foreseeable"].)

Foreseeability is also relevant when considering the effect of an intervening act on the chain of causation. (See *Roberts*, *supra*, 2 Cal.4th at pp. 321–322.) "To relieve a defendant of criminal liability, an intervening cause must be an unforeseeable and extraordinary occurrence. [Citation.] The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*Crew*, *supra*, 31 Cal.4th at p. 847; see *Schmies*, *supra*, 44 Cal.App.4th at p. 49 ["An 'independent' intervening 'act may be so disconnected and unforeseeable as to be a superseding cause, i.e., in such a case the defendant's act will be a remote, and not the proximate, cause' "].) "The act of another constitutes a superseding cause precluding responsibility of the initial actor only if the other's conduct is both unforeseeable and causes harm that was not the foreseeable consequence of the initial actor's conduct." (*People*

*v. Brady* (2005) 129 Cal.App.4th 1314, 1329–1330 [whether in-air collision deaths of two firefighter pilots were "reasonably foreseeable consequences" of fire recklessly started near methamphetamine laboratory].)

With this proximate cause framework in mind, we turn to *Sanchez* and its use of the term "substantial concurrent cause."

## B. *Sanchez*

In *Sanchez*, this court held that the act of a defendant who may not have fired the fatal bullet was sufficient to establish proximate cause because the act — engaging a rival gang member in a public gun shootout — was a "substantial concurrent cause" of the victim's death. (*Sanchez*, *supra*, 26 Cal.4th at p. 845; see *id.* at pp. 854–857 (conc. opn. of Kennard, J.).) The parties here offer competing views of what we meant by "substantial concurrent cause."

The Mitchells contend that "*Sanchez*'s 'substantial concurrent causation' theory . . . only makes sense where the actual killer is unknown." In their view, "[w]here the facts show that either defendant's bullet could have killed the bystander, *Sanchez* treats each defendant's act in shooting as a 'substantial' cause of the bystander's death, applying a *lesser standard*" than actual causation to find defendant guilty of the bystander's murder. So understood, *Sanchez* and its "substantial concurrent causation" rule of liability are inapplicable here because the evidence affirmatively establishes that someone other than the Mitchells fired the fatal shot. To conclude otherwise, the Mitchells contend, would render actual causation a "legal fiction" in this case because neither of them fired the fatal shot.

The Attorney General submits a different understanding of "substantial concurrent cause" and emphasizes the general

reach of *Sanchez*'s holding. He contends that our conclusion in *Sanchez* did not turn on any lack of evidence establishing who fired the fatal shot. Rather, he asserts, our application of the substantial concurrent causation theory focused on the "effect of the defendant's actions as they relate to the killing and that defendant's personal culpability." In other words, the Attorney General argues that the Mitchells' actions of engaging in a gun battle in a crowded public place satisfy the proximate cause requirement and, together with their intent to kill Carney and Jones, support their convictions for the first degree murder of Monique.

In *Sanchez*, defendant Julio Cesar Sanchez and rival gang member and codefendant, Ramon Gonzalez, engaged in a public gun battle that resulted in a bystander's death. In summarizing the case, we stated: "We know a single stray bullet was the actual, direct cause of death. At the close of evidence all parties agreed it could not be established [which defendant] had fired the fatal shot." (*Sanchez*, *supra*, 26 Cal.4th at p. 845.) After being instructed on proximate causation,[6] the jury convicted

---

[6] The *Sanchez* jury was instructed: " 'A cause of death is an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act, the death of a human being, and without which the death would not occur. [¶] There may be more than one cause of the death. [¶] *When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death.* [¶] A cause is a concurrent cause if it was operative at the moment of death and acted with another force to produce the death. [¶] If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person also contributed to the death.' " (*Sanchez*,

both defendants of first degree murder. (*Id.* at p. 839.) The Court of Appeal reversed Sanchez's conviction, concluding that in a single-fatal-bullet case "concurrent causation could not serve as a basis for finding both defendants liable for premeditated first degree murder" because there was only one " 'direct or actual' " cause of death rather than two or more such causes. (*Id.* at p. 844.)

We reversed the Court of Appeal's judgment, holding that "[t]he circumstance that it cannot be determined who fired the single fatal bullet, i.e., that direct or actual causation cannot be established, does not undermine defendant's first degree murder conviction if it was shown beyond a reasonable doubt that defendant's conduct was a substantial concurrent cause of [the bystander]'s death." (*Sanchez, supra*, 26 Cal.4th at p. 845.) We explained that "it is proximate causation, not direct or actual causation, which, together with the requisite culpable mens rea (malice), determines defendant's liability for murder." (*Ibid.*) We concluded that Sanchez's "act of engaging Gonzalez in a gun battle and attempting to murder him was a substantial concurrent, and hence proximate, cause of [the bystander's] death." (*Id.* at p. 839.)

Although *Sanchez* was the first decision in which we used the term "substantial concurrent cause" in this context, *Sanchez* did not articulate a new theory of causation or, as the Mitchells assert, announce a "reduced" standard of causation that served

_____

*supra*, 26 Cal.4th at pp. 843, 845, italics added; see CALJIC Nos. 3.40, 3.41.)

The corresponding CALCRIM instruction on murder given in the instant case (CALCRIM No. 520) incorporated the same proximate cause language as this instruction in *Sanchez*.

to lessen the prosecution's burden of proof. Rather, the term "substantial concurrent cause" embraces familiar causation concepts of substantial factor and concurrent cause. (See *ante*, at pp. 7–8.) It reflects key principles from CALJIC Nos. 3.40 and 3.41, which together "correctly define proximate causation" when there is evidence of more than one cause of death. (*People v. Bland* (2002) 28 Cal.4th 313, 338; see *Sanchez, supra*, 26 Cal.4th at pp. 843, 845.)

For instance, as given in *Sanchez* CALJIC No. 3.41 explained that " '[w]hen the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the death. [¶] A cause is a concurrent cause if it was operative at the moment of death and acted with another force to produce the death.' " (*Sanchez, supra*, 26 Cal.4th at p. 845; see *ante*, at p. 11, fn. 6.) In turn, " 'cause of death' " was defined in *Sanchez* as " 'an act that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act, the death of a human being . . . .' " (*Sanchez, supra*, 26 Cal.4th at p. 845, see CALJIC No. 3.40; see also *ante*, at p. 11, fn. 6.) Drawn from these instructions, the term "substantial concurrent cause" used in *Sanchez* accurately describes proximate cause, encompassing the components of (1) cause in fact — i.e., requiring the defendant's conduct to be a "substantial factor" contributing to the bystander's death, and (2) policy considerations — i.e., limiting liability for that which is the "direct, natural and probable consequence" of the defendant's act. (See *ante*, at pp. 7–8.)

In concluding that the defendants' life-threatening deadly actions in *Sanchez* constituted the "substantial concurrent, and hence proximate, cause" of the bystander's death, the *Sanchez*

majority emphasized the defendants' acts of "engag[ing] one another in a gun battle on a public street in broad daylight" (*Sanchez*, *supra*, 26 Cal.4th at p. 852) and making "simultaneous attempts to murder one another in a preplanned blaze of gunfire" (*id*. at p. 853). These mutual acts were without question concurrent, substantial factors contributing to the bystander's death. Quoting Justice Kennard's concurrence, the majority concluded: " 'Because [Sanchez] and Gonzalez had equally culpable mental states and engaged in precisely the same conduct at the same time and place in exchanging shots, it is not unfair to hold them equally responsible for [the bystander's] death, without regard to which of them actually fired the bullet that struck and killed [the bystander].' " (*Id*. at p. 854, quoting *id*. at p. 856 (conc. opn. of Kennard, J.).) Justice Kennard, who signed the majority opinion in *Sanchez*, reiterated these concurrent cause principles in her separate concurrence, explaining: "In legal terms, [Sanchez] committed the act of killing [the bystander] if his conduct was a legal or proximate cause of [that] death" even if it was Gonzalez who fired the fatal bullet. (*Id*. at p. 855 (conc. opn. of Kennard, J.).)[7]

Justice Kennard went on to discuss in her *Sanchez* concurrence whether Gonzalez's conduct — firing at Sanchez "with a deliberate and premeditated intent to kill [him]" — "must in law be regarded as a 'superseding cause' that cut off [Sanchez's] responsibility for any injury or death inflicted by the

---

[7]    In this part of her concurrence, Justice Kennard examined the possibility that Gonzalez rather than Sanchez fired the bullet that killed the bystander and explained why this possibility did not preclude a finding that Sanchez's own "conduct caused [the] death." (*Sanchez, supra,* 26 Cal.4th at p. 855 (conc. opn. of Kennard, J.).)

bullets that Gonzales fired." (*Sanchez, supra,* 26 Cal.4th at p. 855 (conc. opn. of Kennard, J.).) She answered this question in the negative, explaining: "In law, the term 'superseding cause' means "an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible." [Citation.] Here, [Sanchez] and Gonzalez during their gun battle were attempting to kill each other, so that the killing of a bystander was a harm that both in kind and degree was within the risk that [Sanchez] and Gonzalez must have expected. Because they each expected and intended a death to occur, and a death did occur in a manner that was entirely foreseeable, it does not matter, for purposes of determining proximate or legal cause under criminal law, that the person killed was not the precise object of their lethal intent." (*Id.* at pp. 855–856 (conc. opn. of Kennard, J.).)

Although the *Sanchez* majority did not refer to the issue of superseding cause, its opinion should not be read as eliminating that issue from the causation analysis in concurrent cause cases. The focus of the majority's analysis was the Court of Appeal's erroneous conclusion that, as a matter of law, "concurrent causation cannot be established in a single-fatal-bullet case." (*Sanchez, supra,* 26 Cal.4th at p. 839.) That the majority, in considering this narrow and specific legal question, did not also discuss superseding cause did not — and was not intended to — render the superseding cause question irrelevant to the determination of proximate cause. To the extent that *Sanchez* could be understood as suggesting otherwise, we now clarify that the question of superseding cause — as Justice Kennard's concurrence recognized — remains part of the proximate cause analysis in concurrent cause cases.

Notably, the existing instructions on causation already incorporate the concept of any unforeseeable, superseding cause. CALJIC No. 3.40's requirement that an injury or death be a direct, natural, and probable consequence of a defendant's act "necessarily refers to consequences that are reasonably foreseeable." (*Fiu*, *supra*, 165 Cal.App.4th at p. 372; see CALCRIM No. 240 ["A *natural and probable consequence* is one that a reasonable person would know is likely to happen *if nothing unusual intervenes*" (second italics added)].) Thus, if an intervening cause is a reasonably foreseeable result of a defendant's initial act, " ' "the intervening act is 'dependent' and not a superseding cause, and will not relieve [the] defendant of liability." ' " (*Cervantes*, *supra*, 26 Cal.4th at p. 871.) Conversely, "[a] result cannot be the natural and probable cause of an act if the act was unforeseeable." (*Roberts*, *supra*, 2 Cal.4th at pp. 321–322.) Based on this foreseeability inquiry, therefore, a jury necessarily considers, in its determination of proximate cause, whether there was any intervening cause that was unforeseeable and constituted a superseding cause. (See *id.* at p. 320, fn. 11 [question of foreseeability will ordinarily be for jury to decide — "there is no bright line demarcating a legally sufficient proximate cause from one that is too remote"].)

*Sanchez*'s conclusion that both shooters in a gun battle may be guilty of murder even though only one was the actual shooter was consistent with then-existing California decisions. For instance, California case law recognized that a defendant may be guilty of first degree murder where there are multiple proximate causes of death (see *People v. Mai* (1994) 22 Cal.App.4th 117, 123, fn. 5); *People v. Kemp* (1957) 150 Cal.App.2d 654, 658). (*Sanchez*, *supra*, 26 Cal.4th at pp. 846–847.) We also note that several decisions from our sister states

have similarly viewed a defendant's culpability in connection with gun battles. (See e.g., *State v. Young* (2020) 429 S.C. 155, 161 [838 S.E.2d 516, 519] ["The majority of jurisdictions impose criminal responsibility on all combatants for the consequences of mutual combat"]; *Commonwealth v. Santiago* (1997) 425 Mass. 491, 504, 681 N.E.2d 1205, 1215 ["By choosing to engage in a shootout, a defendant may be the cause of a shooting by either side because the death of a bystander is a natural result of a shootout, and the shootout could not occur without participation from both sides"]; *Alston v. State* (1995) 339 Md. 306, 309 [662 A.2d 247, 248] [" 'The deadly homicidal force . . . was a collective hail of bullets, a collective fusillade, with no further parsing required. Which bullet came from which gun is inconsequential' "].)[8]

In this case, although there was no evidence that either of the Mitchells intended to or actually did shoot Monique, the evidence did establish the following: A week before the shootout, Lonnie Mitchell had threatened to kill a G-Mobb gang member. On the day of the shooting, the Mitchells armed themselves and headed to a barbershop that was a known hangout of the G-Mobb. After entering the barbershop, Lonnie

---

[8] Some of our statements in *Sanchez* could be read as suggesting that the actual or direct cause of the bystander's death is not relevant to the proximate cause determination. (See, e.g., *Sanchez, supra,* 26 Cal.4th at p. 845 ["it is proximate causation, not direct or actual causation, which, together with the requisite culpable mens rea (malice), determines defendant's liability for murder"]; *id.* at p. 854 [both defendants are guilty " 'without regard to which of them actually fired the bullet that struck and killed' " the bystander].) To clarify, proximate cause consists of both cause in fact and policy considerations. (See *ante,* at pp. 7–8.)

Mitchell told someone over the phone he wanted to "shoot the place up." Jones then summoned Carney for help. When Carney, Barksdale, and others arrived at the barbershop, Lonnie Mitchell shot at Carney and Louis Mitchell shot his assault weapon wildly. During the public shootout, the Mitchells shot and killed an adversary, Barksdale, and shot and injured four bystanders in the barbershop. In returning the Mitchells' gunfire, Carney shot and killed Monique.

Even though the evidence established that neither of the Mitchells fired the fatal shot, their first degree murder convictions are consistent with *Sanchez*'s holding that a defendant's "life-threatening deadly acts" in a gun battle may be a proximate cause of a bystander's death. (*Sanchez, supra*, 26 Cal.4th at pp. 848–849.) The jury's return of varying verdicts as to the four defendants — convicting the Mitchells of first degree murder and acquitting Jones, while convicting Carney, who fired the fatal shot, of only voluntary manslaughter — further reveals that the jury did not base its verdict on the defendants' mere participation in the gun battle, but carefully considered the Mitchells' own actions and their personal mens rea. These differing verdicts reflect that the jury determined each defendant's own mental state and assigned culpability accordingly. The conduct of each of the Mitchells constituted a "substantial concurrent cause" of the bystander's death. (*Sanchez, supra*, 26 Cal.4th at p. 845.)

The Mitchells, however, contend that *Jennings, supra*, 50 Cal.4th 616 supports their interpretation of the "substantial concurrent cause" rule and their view that the rule does not apply where, as here, only one bullet hit and killed a bystander. In *Jennings*, the defendant administered lethal doses of sedatives and physically abused and deliberately starved his

five-year-old son. We concluded that the drugs, abuse, and starvation were each a concurrent cause of his son's death. (*Id.* at p. 641 [evidence showed defendant administered drugs to son and directed wife to do the same].) We emphasized that in the end, " '[a]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death.' " (*Id.* at p. 643, quoting *People v. Catlin* (2001) 26 Cal.4th 81, 155.) We applied the "substantial factor" test of cause in fact because there was evidence of more than one cause of death, not because the primary cause of death was unknown. (*Jennings, supra,* 50 Cal.4th at pp. 643–644; see *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1049, 1052.) Contrary to the Mitchells' suggestion, *Jennings* does not compel a different interpretation of "substantial concurrent cause" as set out in *Sanchez.*

### C. *Chiu* and Senate Bill No. 1437

As noted (see *ante,* at p. 2, fn. 1), our grant of review included the question of what impact, if any, *People v. Chiu, supra,* 59 Cal.4th 155 (*Chiu*) and Senate Bill No. 1437 (Stats. 2018, ch. 1015, § 1, subd. (f)) have on the *Sanchez* rule. The Mitchells argue that *Sanchez*'s "substantial concurrent cause" analysis is "a type of natural and probable consequences liability that is inconsistent" with *Chiu* and Senate Bill No. 1437. As we explain below, the Mitchells incorrectly assume that the term "natural and probable consequences" refers only to an aider and abettor's vicarious liability. (See *Roberts, supra,* 2 Cal.4th at p. 320.) Therefore, we are unpersuaded by their effort to bring the definition of proximate cause, which deals with the actus reus of a crime (see, *ante,* at p. 6), within the ambit of Senate Bill No. 1437 and *Chiu*'s discussion of the natural and probable

19

consequences doctrine, which both concern the mens rea of a crime. We conclude that Senate Bill No. 1437 and *Chiu* have no direct effect on our holding in *Sanchez*.

Before *Chiu*, *supra*, 59 Cal.4th 155, an accomplice who aided and abetted a crime could be liable, not only for that target offense, but also for any additional offense (including murder) under the natural and probable consequences doctrine even if the accomplice did not intend the additional offense. (*Id.* at p. 164 ["natural and probable consequences doctrine is based . . . 'on the policy [that] . . . aiders and abettors should be responsible for the criminal harms they have naturally, probably, and foreseeably put in motion' " (italics omitted)].) In *Chiu*, we held that the natural and probable consequences rule of *accomplice liability* did not extend to first degree premeditated murder because imposing such vicarious liability on an *aider and abettor* — one who did not possess the "uniquely subjective and personal" mental state for first degree murder — would not serve "legitimate public policy considerations of deterrence and culpability." (*Chiu*, at p. 166.) In 2018, the Legislature amended section 188 through Senate Bill No. 1437 to provide that "[e]xcept as stated in subdivision (e) of Section 189 [governing felony murder], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2.) We subsequently held that this amendment applied to second degree murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 839.)

Insofar as the proximate cause instruction quoted in *Sanchez*, *supra*, 26 Cal.4th at page 845, refers to a death that is " 'a direct, natural and probable consequence of' " the

defendant's act, it does not concern the imputed malice theory of criminal liability that is part of the natural and probable consequences doctrine of accomplice liability affected by *Chiu* and Senate Bill No. 1437. (See *Roberts*, *supra*, 2 Cal.4th at p. 320.) Understanding the rationale for the addition of the "natural and probable consequences" language to the proximate cause instruction is helpful in resolving the question before us.

In 1992, the CALJIC committee added the language to the causation instruction (CALJIC No. 3.40) after we clarified the causation requirement in certain jury instructions. (See *Mitchell v. Gonzales*, *supra*, 54 Cal.3d at p. 1052 [disapproving BAJI No. 375 because it asked jury to "focus improperly on the cause that is spatially or temporally closest to the harm"]; *Roberts*, *supra*, 2 Cal.4th at pp. 321–322 [instructions effectively told the jury to disregard foreseeability when determining the proximate cause of an injury].) Our decisions explained that "[t]he criminal law . . . is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." (*Roberts*, at p. 319.)

Thereafter, with our pronouncements from *Roberts* and *Mitchell v. Gonzales* expressly in mind, the CALJIC committee revised CALJIC No. 3.40 to add the phrase "direct, natural and probable consequence." (*People v. Temple* (1993) 19 Cal.App.4th 1750, 1756 [1992 revision to CALJIC No. 3.40 "correctly embodies the *Mitchell v. Gonzales-People v. Roberts* test of proximate cause"]; see CALCRIM No. 240.) Contrary to the Mitchells' argument, the reference to "direct, natural and probable consequence" in the proximate cause jury instruction, which deals with the actus reus of murder, does not implicate concerns regarding imputed mens rea and vicarious liability

21

identified in *Chiu* and Senate Bill No. 1437.

Based on the foregoing, we conclude that *Chiu* and Senate Bill No. 1437 do not impact or otherwise inform the question of *Sanchez*'s application in this case.

## CONCLUSION

Because the trial court, consistent with our holding in *Sanchez*, *supra*, 26 Cal.4th 834, properly instructed the jury on substantial concurrent causation with respect to Monique's death, we affirm the Court of Appeal's judgment.

**JENKINS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Carney

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 12/10/19 – 3d Dist.
**Rehearing Granted**

_____

**Opinion No.** S260063
**Date Filed:** July 20, 2023

_____

**Court:**  Superior
**County:**  Sacramento
**Judge:**  Kevin J. McCormick

_____

**Counsel:**

Law Offices of Beles & Beles, Robert J. Beles, Paul McCarthy and Micah Reyner for Defendants and Appellants Louis Mitchell and Lonnie Mitchell.

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant James Leo Carney.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Stephen G. Herndon, Carlos A. Martinez, Catherine Chatman, Eric L. Christoffersen, Rachelle A. Newcomb and Kimberly A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

Keiter Appellate Law and Mitchell Keiter for Amicus Populi as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Micah Reyner
Law Offices of Beles & Beles
1 Kaiser Plaza, Suite 2300
Oakland, CA 94612
(510) 836-0100

Kimberley A. Donohue
Deputy Attorney General
1300 I Street
Sacramento, CA 94244
(916) 210-6135